## SOUTHERN RAILWAY COMPANY *v.* JAMES.

Where a servant does an act in the execution of a lawful authority given him by his master and for the purpose of performing what the master has directed, the master will be liable for an injury thereby inflicted on another, whether the wrong be occasioned by negligence or by a wanton and reckless purpose to accomplish the master's business in an unlawful manner.

In the present case there was evidence from which the jury could find that the wrong done by the servant was done within the range of his employment and for the purpose of accomplishing the business which the master had authorized him to do.

Argued May 8, — Decided August 11, 1903.

Action for damages. Before Judge Reece. City court of Floyd county. August 13, 1902.

*Shumate & Maddox* and *Harris & Chamlee*, for plaintiff in error.
*W. H. Ennis, Seaborn & Barry Wright*, and *Dean & Dean*, contra.

SIMMONS, C. J. It appears from the record that Saunders was the yardmaster, in East Rome, of the Southern Railway Company. He employed Ford as night watchman of the company, to look after the property and interests of the company in the East Rome yards, and for the purpose of arresting trespassers who were stealing or attempting to steal rides on the trains of the company which passed through those yards. It was also the duty of Ford to attend the switch-lights in the yards. On the night of July 19 or 20, 1899, Ford caught James, the defendant in error, on the top of a box-car, it being the purpose of James to steal a ride on the train. Ford ordered him to get down. He obeyed, and Ford arrested him. James resisted to such an extent that Ford had to call in assistance. Ford then started with James to the calaboose of the town, where it had been the custom to confine prisoners of this character. Ford

testified that he made the arrest for the company and as its employee. On the way to the calaboose James broke away from Ford
and ran. Ford commanded him to halt, but James kept running.
The night was dark, and Ford then, according to his own testimony,
fired in about the direction in which James had run, not to hit
him but to frighten him and cause him to stop so that Ford could
"arrest him and lock him up." The bullet from Ford's pistol struck
James in one of his legs, which had to be amputated above the knee.
James brought suit against the railroad company for the injuries
thus received, and the jury, on the trial of the case, returned a verdict in his favor for $500. The company moved for a new trial
upon several grounds. The motion was overruled, and the company excepted.

The view we take of the case renders it unnecessary to discuss
seriatim the grounds of the motion for new trial. All of them
hinge upon the question as to whether, under the facts, the company is liable to James for the injury inflicted by its employee.
That Ford was an employee of the company there is no doubt, the
only doubt in the case arising upon the question whether the acts
done by him were within the line of his employment. If they were,
then under the law the defendant is liable; if they were not, but
were simply the individual acts of Ford, the company is not liable.
Our Civil Code, § 3817, declares that the master shall be liable for
the torts of his servant when done in the prosecution and within
the scope of his business, whether the same be by negligence or
voluntary. Were the acts committed by Ford within the scope and
range of the business for which he was employed or in and about
that business? Ford swears positively that Saunders, the yardmaster, employed him. During the negotiation prior to his employment, Saunders asked him if he was afraid to arrest tramps. Ford
replied in the negative. Saunders then told him he was to arrest
all tramps or other persons stealing rides upon any of the company's
trains coming into or going out of East Rome, and to take charge
of them. What was the authority of Saunders to employ Ford for
this purpose does not affirmatively appear from the record. The
plea of the company denied his authority to employ Ford and authorize him to make arrests, but there was no evidence to support
this plea. The evidence did show that Saunders employed Ford
and others and discharged others. It also showed that, after the

employment of Ford by Saunders, Ford was paid his salary by the railroad company.    It also appeared from the evidence that Ford's predecessors in office had arrested persons stealing rides and confined them in the calaboose until morning, when they were turned over to the State officers.    This was sufficient we think, to authorize the jury, in the absence of evidence to the contrary, to infer that Saunders had authority to employ Ford as a night watchman, not only to watch over the company's property, but to make arrests for the company.    It is also proper to note that there is a statute of force in Georgia making it a penal offense to steal a ride upon a railroad train.    It was argued, however, by the learned counsel for the plaintiff in error, that, even if Ford had authority to arrest James, he had no right to imprison him or to shoot him on the way to the prison.    While there was no evidence to show that Ford was expressly instructed to confine his prisoners in the calaboose, there was evidence that his predecessors had done so.    Even in the absence of proof of such a custom, we think the authority to confine the prisoner necessarily followed the authority to arrest.    This was one of the incidents of the arrest.    If Ford could not imprison one arrested, what was the use of the arrest? The town marshal was shown not to be on duty at night, and some disposition had to be made of the prisoner.    It could not have been expected that Ford would personally hold his prisoners all night and neglect his other duties.    To tie them or lock them up at the yards could scarcely have been expected of him, nor would either of these methods have required less authority than to confine the prisoners in the town calaboose.    The calaboose was the proper place to put them in until they could be turned over to the State's officers to be held for trial.    We hold, therefore, that the authority to arrest carried with it the authority to take the prisoner to the calaboose and there confine him until he could be turned over to the proper officers.    When an agent is authorized to do a thing, he has implied power to do all the acts necessarily incidental to doing the thing authorized.

Having shown that Ford was authorized to arrest and imprison, the next question to arise is whether the company is liable for the injury which James sustained as a consequence of the shot from Ford's pistol.    The code section cited above declares that the master is liable for the torts of the servant within the scope of the mas-

ter's business, whether such torts be negligent or willful.    This
seems to be the settled law in all the jurisdictions in this country
in which the common law prevails.    Where a master instructs a
servant to do a lawful act, and the servant, while engaged in the
master's business and intending to do the act authorized, is reck-
less in the performance of the act and inflicts injury on another,
the master is liable.    Webb's Pollock on Torts, 103.    So if the
servant, acting in the way of his employment and on his master's
account, willfully and deliberately commit a wrong, the master is
liable.    Ibid. p. 109.    See also Reinhard on Agency, §§ 485, 486.
The rule is thus well stated by Hoar, J., in Howe v. Newmarch,
12 Allen, 49, 56:   "The master is not responsible as a trespasser
unless by direct or implied authority to the servant he consents
to the wrongful act.    But if the master give an order to a servant
which implies the use of force and violence to others, leaving to
the discretion of the servant to decide when the occasion arises to
which the order applies, and the extent and kind of force to be used,
he is liable, if the servant in executing the order makes use of force
in a manner or to a degree which is unjustifiable.    And in an ac-
tion of tort in the nature of an action on the case, the master is
not responsible if the wrong done by the servant is done without
his authority, and not for the purpose of executing his orders or
doing his work.    So that if the servant, wholly for a purpose of
his own, disregarding the object for which he is employed, and not
intending by his act to execute it, does an injury to another, not
within the scope of his employment, the master is not liable.    But
if the act be done in the execution of the authority given him by
his master, and for the purpose of performing what the master
has directed, the master will be responsible, whether the wrong
done be occasioned by negligence, or by a wanton or reckless pur-
pose to accomplish the master's business in an unlawful manner."
In the case now under consideration, the servant had full authority
from the master to arrest the plaintiff.    If made in a proper way,
this arrest would have been entirely lawful.    Indeed the arrest was
properly made and was a lawful arrest.    Acting still within his au-
thority and being still within the law, the servant undertook to
imprison the person he had arrested.    To do this it was necessary
to take him to the calaboose where he was to be confined.    So far,
the servant was clearly within his authority, and did nothing which

was illegal.    In endeavoring, however, to take the prisoner to the place of confinement, when the prisoner broke away and ran, the servant negligently, recklessly, and wantonly fired in the prisoner's direction in order to frighten him into halting.    The authority to make the arrest and to confine the prisoner implied the authority to use such force or violence as was necessary.    The servant, through a want of judgment and discretion, used an unjustifiable amount and character of force and violence.    He did so in an attempt to execute the authority to arrest and imprison, and the master is liable for the injury thus wrongfully inflicted upon the plaintiff.    Counsel for the plaintiff in error laid much stress on the fact that the shooting of the plaintiff was a criminal act, and argued that it was, therefore, an act which could not be authorized.    The arrest and imprisonment of persons violating the statute against stealing rides on railroad trains were, however, lawful acts which could be authorized and which were in fact authorized.    The crime committed by the servant was in his injudicious attempt to execute this lawful authority in an unlawful manner.    It was the means adopted by the servant for the purpose of performing the authorized work of the master.    The civil liability of the master is not affected in such a case by the fact that the servant has rendered himself criminally liable.    If the criminal act of the servant was done within the range of his employment and for the purpose of accomplishing the authorized business of the master, the latter is liable.    Applying these rules of law to the present case, there was evidence from which the jury could find that the defendant was liable for the injuries inflicted upon the plaintiff.    See 20 Am. & Eng. Enc. L. (2d ed.) 169-176 ; Noblesville &c. R. *v.* Gause, 40 Am. Rep. 224, and note ; Smith *v.* L. & N. R. Co. (Ky.), 23 S. W. 652 ; note to Goodloe *v.* Railroad Co., 54 Am. St. Rep. 71 ; Higgins *v.* W. T. & R. Co., 46 N. Y. 23, 7 Am. Rep. 293 ; Cooley on Torts (2d ed.), 626 et seq.; Addison on Torts (Wood's ed.), 46, § 36 ; 1 Jaggard on Torts, 251 et seq.

*Judgment affirmed.    By five Justices.*